Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

# UNITED STATES DISTRICT COURT
for the
Western District of Pennsylvania ▼

| | |
|---|---|
| Gregg A. Dektor | Case No. 2:20-cv-01917 |
| _Plaintiff(s)_ | _(to be filled in by the Clerk's Office)_ |
| (Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) | Jury Trial: _(check one)_ ✓ Yes ☐ No |
| -v- | |
| KPMG, LLP, et al. | |
| _Defendant(s)_ | |
| (Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) | |

## AMENDED COMPLAINT FOR EMPLOYMENT DISCRIMINATION

**I.     The Parties to This Complaint**

    **A.     The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Gregg A. Dektor |
| Street Address | 131 Ridgemont Drive |
| City and County | Cranberry Township and Allegheny |
| State and Zip Code | Pennsylvania, 16066 |
| Telephone Number | (412)916-4588 |
| E-mail Address | gdektor@gmail.com |

    **B.     The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title _(if known)_. Attach additional pages if needed.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

Defendant No. 1

    Name: KPMG, LLP
    Job or Title *(if known)*:
    Street Address: 500 Grant Street, Suite 3400
    City and County: Pittsburgh and Allegheny
    State and Zip Code: Pennsylvania, 15219
    Telephone Number: -
    E-mail Address *(if known)*:

Defendant No. 2

    Name:
    Job or Title *(if known)*:
    Street Address:
    City and County:
    State and Zip Code:
    Telephone Number: -
    E-mail Address *(if known)*:

Defendant No. 3

    Name:
    Job or Title *(if known)*:
    Street Address:
    City and County:
    State and Zip Code:
    Telephone Number: -
    E-mail Address *(if known)*:

Defendant No. 4

    Name:
    Job or Title *(if known)*:
    Street Address:
    City and County:
    State and Zip Code:
    Telephone Number:
    E-mail Address *(if known)*:

C. **Place of Employment**

The address at which I sought employment or was employed by the defendant(s) is

| | | |
|---|---|---|
| Name | KPMG, LLP | KPMG, LLP |
| Street Address | 1601 Market Street | 500 Grant Street |
| City and County | Philadelphia and Philadelphia | Pittsburgh and Allegheny |
| State and Zip Code | Pennsylvania, 19103 | Pennsylvnia, 15219 |
| Telephone Number | (267) 256-1600 | |

II. **Basis for Jurisdiction**

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☑ Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☑ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☑ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐ Other federal law *(specify the federal law)*:

☐ Relevant state law *(specify, if known)*:

☐ Relevant city or county law *(specify, if known)*:

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

### III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A. The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

- [ ] Failure to hire me.
- [✓] Termination of my employment.
- [ ] Failure to promote me.
- [✓] Failure to accommodate my disability.
- [✓] Unequal terms and conditions of my employment.
- [✓] Retaliation.
- [✓] Other acts *(specify)*: Harrassment

(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)

B. It is my best recollection that the alleged discriminatory acts occurred on date(s)
Beginning December 12, 2019 continuously until my employment was terminated October 16, 2020

C. I believe that defendant(s) *(check one)*:
- [ ] is/are still committing these acts against me.
- [✓] is/are not still committing these acts against me.

D. Defendant(s) discriminated against me based on my *(check all that apply and explain)*:
- [ ] race
- [ ] color
- [✓] gender/sex    male
- [ ] religion
- [ ] national origin
- [✓] age *(year of birth)*    1967    *(only when asserting a claim of age discrimination.)*
- [✓] disability or perceived disability *(specify disability)*
    Mental Health

E. The facts of my case are as follows. Attach additional pages if needed.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

See Attachment 1

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

IV. **Exhaustion of Federal Administrative Remedies**

A. It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

September 22, 2020

B. The Equal Employment Opportunity Commission *(check one)*:

☐ has not issued a Notice of Right to Sue letter.

☑ issued a Notice of Right to Sue letter, which I received on *(date)*  09/29/2020  .

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C. Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐ 60 days or more have elapsed.

☐ less than 60 days have elapsed.

V. **Relief**

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

1. That the Court grant full front pay to the Plaintiff;
2. That the Court grant Plaintiff compensatory damages for the humiliation, emotional distress, and other damages caused by Defendants' conduct;
3. That the Court grant Plaintiff punitive damages for Defendants' malicious and recklessly indifferent conduct;
4. That the Court grant Plaintiff all employment benefits he would have enjoyed had she not been discriminated andretaliated against;
5. That the Court grant Plaintiff expenses of litigation,including reasonable attorneys' fees, pursuant to the Title VII, and/or 42 U.S.C. § 1988;
6. That the Court grant Plaintiff a jury trial and all other relief the Court deems just and proper.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 2/25/2021

Signature of Plaintiff: *Gregg Dektor*

Printed Name of Plaintiff: Gregg Dektor

### B. For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

**Attachment 1**

1. I was hired May 26, 2015 under the following arrangement. I would commute from Pittsburgh to Philadelphia every week Monday to Thursday and work from home in Pittsburgh Friday. I was assigned to the Philadelphia office for all internal and external purposes including local Philadelphia payroll reporting.

2. This arrangement changed in 2018 when I was instructed by KPMG to manipulate my location reporting by time in its internal system to report less than 50% of my time to Philadelphia due to the increased tax implications it was creating for KPMG.

3. My recurring clients were all located in Philadelphia, PA, Paramus, NJ, and Princeton, NJ  I was never assigned or worked on any Pittsburgh based clients.

4. KPMG is a September 30 year end Company. The performance review system used by KPMG includes an informal semi-annual review to only address areas of major strength or weakness with no other documentation provided. The annual review occurs in late August and covers the previous period October 1 projected until September 30 of the current year.

5. KPMG does not have a ranking system in the performance review process. There is no numerical data provided in terms of how anyone's performance was rated. For example, many employers use a scale of "1" to "5" to rank employee performance but not KMPG. The process is to have a meeting with your assigned People Mentor Leader ("PML") who discusses your annual performance based on feedback in the meeting. Then a summary document is provided from your PML on your annual performance. Everyone at KPMG is assigned a PML. The PML helps guide an individual's career progression and is the main point of contact for each employee.

6. For the years ending September 30, 2016, 2017, 2018 and 2019 my annual performance reviews have been extremely positive with little or no mention of any areas of improvement. My September 30, 2019 review quoted "**Gregg had a solid year and made contributions in our flow thru compliance practice, our M&A tax support, and on our major consulting and return review projects. Gregg also acts as a mentor to many of our associates and managers and has excellent upward feedback results**". There were no areas of concern raised in this review. In all my reviews over the four years there was never any indication there was ever a problem with my performance. As a result, I received appropriate annual pay raises and/or annual bonuses in each of these years.

7. On December 12, 2019, my PML notified me the Pennsylvania Tax Practice Leader, Pete Beale, was not happy with my performance on a minor situation a month or two earlier. I rarely ever interacted with Pete Beale. I am the lowest level in the management group and several levels removed from Beale.

8. I offered to assist on another team's project because they needed help. I reviewed already completed tax returns but missed a couple presentation errors. It is critical to note there was no tax impact just how items are labeled and explained. I assisted for a total of twelve hours on a project KPMG spent over five thousand hours. It was not my client but never thought my selfless act would create such anger.

9. I was told by my PML that Pete Beale was so angry he was considering documenting this incident but decided not to formally document. Further, that Pete was having some tough personal issues including the loss of his mother during Thanksgiving and the recent resignation of one of his key partners in Philadelphia. Pete was under fire from his supervisors losing such an important part of the Philadelphia tax practice. I was told Pete merely overreacted about me due to other factors and just wanted my PML to speak to me about the situation. The underlying concern was Pete Beale had a multimillion proposal for work at this exact client but since they won that project his concern was gone.

**Attachment 1**

10. Every year KPMG conducts an annual internal survey to assess several factors of how the business is operating across the US. It is a confidential employee survey completed by tens of thousands to assess overall employee satisfaction with KPMG. This information is then parsed out by office location details and further to the detail level and sub-level of the audit, tax, and consulting practices. This is how the highest levels of leadership at KPMG can see results in each office and can compare to other offices across the US. This is where Pete Beale gets compared to his tax leadership peers in the organization.

11. Based on my five years at KPMG the employee survey results have not been good in the tax practice that I directly report. Although confidential the comments are provided to firm leadership. The annual survey results for the year ending September 30, 2019 included a specific comment that my PML shows favoritism to me and two other named individuals. Pete Beale directly reacted against everyone named. My PML was removed from his Pennsylvania Tax leadership role. Another named person was fired earlier in March 2020 and I was subsequently terminated. The other named person is currently employed but was denied promotion.

12. I have worked in public accounting since 1989. The industry is fast paced, ever changing, and requires significant social interaction both internally with co-workers and externally with existing and prospective clients. The industry not only promotes but actively supports the provision of alcohol by supplying it for no cost at every social event. While at KMPG alone I have seen several senior partners and prominent KPMG leaders get terminated due to alcohol related incidents, both directly and indirectly.

13. I was hired to help grow the Philadelphia practice primarily through social interactions with the staff and managers because employee morale was extremely low in 2015. They had just lost a Partner and Director so wanted me there in a local Philadelphia leadership role to help improve morale. I was provided travel, hotel and expense reimbursement and strongly encouraged to entertain to improve moral. KPMG provided unlimited resources to fuel my problems.

14. I identified as an individual with disabilities when hired at KPMG. I have spinal stenosis caused by years of extensive sitting in an office chair. In addition to this physical disability I was diagnosed with depression and anxiety in 2004. KPMG partners and employees were aware I was treated through both medication and psychotherapy during my entire employment.

15. Although I was always a social alcohol drinker during my career in public accounting, KPMG directly changed the classification of my drinking. During my tenure at KPMG my drinking progressed from three to five drinks a week to three to five drinks every day. Not just beer, wine, or even mixed drinks, but double and triple shots of straight Gin every night. Several KPMG Partners and employees were not only aware of the magnitude of my alcohol consumption, they ordered straight Gin on ice waiting at the dinner table upon my arrival.

16. I was given the nickname "Tanqueray" by the managers and staff that worked for me and encouraged to change my team name in our KPMG fantasy football league to "Greggy D. and the Tanquerays" as early as the Fall of 2017. This group included Partners and Directors of KPMG.

17. During the holiday break from December 16, 2019 to January 5, 2020 my family and I decided it was time for me to seek help by entering a drug and alcohol rehabilitation program. The commitment I made to KPMG directly resulted in what the medical intake social worker diagnosed as alcoholism. My weight increased from 170 pounds to

**Attachment 1**

210 pounds and my total cholesterol level increased from 130 to over 200 in these five years at KPMG.

18. On January 6, 2020 I communicated to my PML and KPMG my intent to go on a medically approved Leave of Absence for mental health and alcohol addiction treatment.

19. I was on leave for 12 weeks and returned to work on April 6, 2020.

20. I had a call April 6, 2020 with my PML and Jon Walls, Partner and Pittsburgh Tax Office Leader. I was informed my office was officially switched from Philadelphia to Pittsburgh and I would no longer be working in Philadelphia. That I would now be directly reporting to Jon Walls and he would serve as my new PML. I was also removed from all my existing clients during my medical leave of absence.

21. I never worked with or for Jon Walls, directly or indirectly. I only met Jon Walls a couple times but never interacted with him on any client or KPMG administrative matters. He is in a totally different tax service line so it never made sense I would report directly to Jon Walls.

22. I was further informed that the firm documented me as "low performance" status for the first half of the new year. That included the period October 1, 2019 to March 31, 2020. I rebutted that I was on approved leave, not even working for three months and the office was closed between Thanksgiving and New Years for a month of this time frame. And that Pete Beale addressed his concerns with me months earlier and previously communicated I was not being written up. I was told that Pete Beale was angry I went out on approved medical leave and accused me of not having any medical problems

23. KPMG took almost six weeks to prepare and provide me with the low performance memo on May 26, 2020. I worked from April 6, 2020 to May 26, 2020 in constant fear operating in a toxic work environment subject to harassment. I formally provided a response on June 2, 2020 disputing all the allegations raised in the low performance memo.

24. The low performance memo was then updated to remove the most important factual misrepresentation. It concluded I did not meet my financial goals for the year ending September 30, 2019 which I in fact did meet so that fabricated negative comment was removed on a subsequently updated low performance memo I received on July 15, 2020, another seven weeks later.

25. During the time frame April 6, 2020 to June 24, 2020 Jon Walls retaliated against me for going out on a leave of absence and then reporting him to KPMG's internal ethics hotline. He placed me in a hostile work environment and attempted to directly control my failure by assigning irrelevant, duplicative, and senseless administrative work tasks. I sent emails documenting my concerns including Jon Walls' responses.

26. In one of many instances Jon Walls agreed my deliverable was great and exactly what he expected from me. Less than a week later Jon Walls sent me a message the deliverable was inadequate. This environment was verbally and mentally abusive but even worse none of these tasks were helping the minor issues KPMG raised on the low performance memo.

27. When the low performance memo was provided on May 26, 2020 Jon Walls gave me two options. The first is to work to overcome what they felt needed improved. Jon would not give me a time frame to improve, but rather would decide daily and if he did not agree to improvements I would be fired at will. The second option was to resign, and they would pay me 60 days severance. During a hundred year worldwide pandemic with unemployment at historical lows the option of finding a new job at the age of 53

**Attachment 1**

did not seem like a practical or fair option.

28. I selected the option to work on improving what they documented as low performance.

29. I was directly told by Jon Walls he felt my better option was to leave KPMG. He told me I do not have what it takes to work at the Big 4. After I have been in the Big 4 for thirty years, twenty-four years at the largest in the world.

30. The most relevant measure of one's performance for a Director or Partner is typically the amount of revenue you generate and/or manage for clients. I always met my required goals and was never an area of concern raised to me formally or informally. My annual revenue goal for the year ending September 30, 2019 was $500,000 which I exceeded.

31. My annual revenue goal for the year ending September 30, 2020 drastically increased from $500,000 to $1,800,000. My revenue requirement more than tripled. When I returned from medical leave of absence on April 6, 2020, I had no revenue because Pete Beale removed me from all my clients of the previous five years. I requested that my revenue requirement be adjusted since there were only six months left in the year and we were in a worldwide pandemic with all our client's offices closed. That I had limited to no ability to generate new firm revenue. KPMG had already adjusted its revenue projection for the firm worldwide decreasing it almost 30% for the year September 30, 2020 while my goal increased by 260% for the identical timeframe. Jon told me I must meet the goal of $1,800,000 and it would not be adjusted.

32. There were two new multimillion National bank projects resulting from the COVID-19 Federal Payroll Protection Program. The firm reached out to everyone in the Country requesting assistance for anyone that could help but Pete Beale rejected my requests to work on those projects. In addition, there was a new consulting project in Pittsburgh I requested to manage. There was no one assigned to manage this new project but again my request to assist was rejected by Jon Walls and Pete Beale.

33. Based on the constant harassment from April 6, 2020 until May 26, 2020 I had a relapse on my medical condition on May 28, 2020, after more than 90 days of sobriety.

34. Realizing my situation was getting worse due to this toxic work environment I decided to go back on leave of absence June 25, 2020 to re-enter intensive drug and alcohol outpatient treatment. It was concluded by the medical doctor and therapists that the work environment I was subject to directly resulted in my relapse.

35. I was approved for short-term medical leave for the time frame June 25, 2020 to September 28, 2020.

36. On July 1, 2020 I filed an inquiry raising discrimination and retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC"). A hearing officer was assigned and conducted an interview with me on August 20, 2020. The hearing officer concluded I had provided enough evidence to file a formal charge of discrimination against KPMG on September 22, 2020. On September 29, 2020, the EEOC closed the case. The hearing officer called me to explain that because as of September 29, 2020 no adverse action was taken against me by KPMG because my employment was not terminated. I was provided ninety days from that date to file this lawsuit in Federal District Court. On October 9, 2020 I was instructed by the same EEOC hearing officer to file a new inquiry with the EEOC since now KPMG had taken adverse action by terminating my employment.

37. On July 20, 2020 KPMG notified me I have exhausted my twelve weeks of protection under the Family Leave and Medical Act effective July 4, 2020. I inquired with KPMG

**Attachment 1**

HR to see how this impacts my currently approved medical leave. The email response I received stated "a leave of absence for a limited period of time is considered a reasonable accommodation under the ADA and the firm will be job protecting your leave through your current return date which is 9/28/20."

38. On September 29, 2020 KPMG held a firmwide call with the entire US practice. I was not invited and not aware of this call as they removed me from all internal KPMG systems upon my return the day prior. I was notified via a national media news posting that evening KPMG was implementing a reduction in workforce plan. They were terminating 1,400 employees in total. However, only 197 of tax professionals which is the group I am assigned. Employees were told HR would contact them the day of September 29, 2020 for notification. No one ever contacted me to notify I was impacted by the terminations.

39. On October 5, 2020 I received a message to call KPMG HR. On October 7, 2020 I was notified via email my employment with KPMG is terminated effective October 16, 2020, due to the reduction in workforce.

40. Pete Beale and Jon Walls have been actively trying to terminate my employment since mid-November 2019, months before anyone heard of COVID-19, the worst worldwide pandemic in over a hundred years. KPMG is attempting to use this tragedy as justification for my termination when in fact I have been discriminated against for now over a year. Further, I have been retaliated against for reporting the treatment I received from Pete Beale and Jon Walls to the KPMG ethics hotline and going out on medical leave in January and June 2020.

41. There are approximately sixty-five tax professionals in the group I reported. Further, there were fifteen individuals at my exact level. These fifteen can be analyzed as follows: Ten are in their 30's. The youngest is age 31 while the oldest is 64. The average age is 38.

42. The only two individuals impacted of the entire sixty-five tax professionals in my group were me at age 53 and the oldest age 64. Both of us are male. During the year October 1, 2019 to September 30, 2020 KPMG only compensated me directly for six of those twelve months the other six I received short term disability from a third-party payor.